**TOWN OF FALMOUTH, MASSACHU-SETTS, by The BOARD OF SELECT-MEN of Said Town consisting of John DeMello, Jr., et al., Plaintiff,**

**v.**

**J. Robert HUNTER, Acting Administrator of the Federal Insurance Administration, Defendant.**

**Civ. A. No. 76–2415–F.**

United States District Court,
D. Massachusetts.

Sept. 20, 1976.

Supplemental Opinion Dec. 13, 1976.

Daniel J. Triggs, Edward W. Farrell, Falmouth, Mass., for plaintiff.

James J. O'Leary, Asst. U. S. Atty., Boston, Mass., William S. Jordan, III, Dept. HUD, Washington, D. C., Gerald D. Freed, Elizabeth Langer, Dept. of Justice, Washington, D. C., for defendant.

## ORDER

FREEDMAN, District Judge.

This matter came before the Court on plaintiff's motion for preliminary injunction to prevent the defendant from suspending plaintiff from the National Flood Insurance Program established pursuant to the National Flood Insurance Act of 1968, Pub.L. No. 90–448, 82 Stat. 572, 83 Stat. 397, as amended, and the Flood Disaster Protection Act of 1973, Pub.L. No. 93–234, 87 Stat. 975, as amended. Plaintiff has, in addition, filed a motion for an order staying its suspension from the above program. Oral argument was heard on Friday, September 17, 1976. Plaintiff has indicated to the Court that its suspension will become effective after September 20, 1976, and that unless its motions are acted upon prior to that time, the question of whether an injunction should issue will become moot.

In light of the exigent circumstances, it is now ordered that plaintiff's motion for preliminary injunction be denied. While a more complete order stating the Court's reasoning will be issued in the near future, I do state at this time that plaintiff has not shown to my satisfaction that it will suffer irreparable harm if its motions are not granted. It is also questionable in my mind whether plaintiff will prevail on the merits of its suit. Finally, contrary to plaintiff's contention, I am satisfied that it was accorded due process when it appealed defendant's determination of the flood levels that are at issue herein. In view of the above, the Court further denies plaintiff's motion for an order staying its suspension from the program.

Accordingly, plaintiff's motions for preliminary injunction and stay order are denied.

## SUPPLEMENTAL OPINION

On September 20, 1976, the Court denied plaintiff's motions for a preliminary injunction and a stay order, both of which would have prevented the defendant from suspending plaintiff from the National Flood Insurance Program established pursuant to

the National Flood Insurance Act of 1968, Pub.L. No. 90–448, 82 Stat. 572, 83 Stat. 397, as amended, and the Flood Disaster Protection Act of 1973, Pub.L. No. 93–234, 87 Stat. 975, as amended. Because plaintiff's suspension was imminent, the Court denied plaintiff's motions without stating its reasoning in any great detail. So that the record in this case will remain clear, that reasoning and the facts pertinent thereto are hereinafter set forth.

42 U.S.C. § 4011 authorizes the Secretary of Housing and Urban Development (HUD) to establish and carry out a national flood insurance program that would make insurance available to cover loss of real property or related personal property caused by flooding in the United States.

Restrictions as to the availability of such insurance are set forth in Sections 4012(c), 4022, and 4102. In essence, those sections require that a community seeking the insurance adopt land use and control measures (including a building permit system), that will mitigate flood hazards, as well as provisions that will effectively enforce such measures. The minimum requirements for these local measures, set by the Secretary pursuant to Section 4102, are delineated in 24 C.F.R. § 1910.3.

A "flood plain area having special flood hazards" has been defined as "that maximum area of the flood plain that, on the average, is likely to be flooded once every 100 years (i. e., that has a 1-percent chance of being flooded each year)." 24 C.F.R. § 1909.1. Following the designation of such an area in a community by the Secretary, a Flood Hazard Boundary Map (FHBM) is issued. Further studies then result in determination of the elevations of the 100-year flood throughout the community. It is from these studies that a Flood Insurance Rate Map (FIRM) is established, which reflects actuarial risk premium rates for the community in question. Thereafter, almost all new construction and substantial improvement must be done above the flood level.

Section 1363 of the 1968 Act, 42 U.S.C. § 4104, sets forth the procedure to be followed by a community appealing the Secretary's determinations. Initially, the flood evaluation determinations are published in a local newspaper. Property owners within the community are then given 90 days in which to appeal those determinations to the local government. At the end of that period the community reviews and consolidates all appeals and decides whether or not to appeal the determinations on behalf of the property owners or to send the individual appeals to the Secretary. The Secretary then reviews "any technical or scientific data . . . that tend to negate or contradict the information upon which his proposed determination is based." Appeals are resolved "by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to an independent scientific body or appropriate Federal agency for advice." 42 U.S.C. § 4104(e). After the Secretary issues a final determination, a community is given a reasonable amount of time "to adopt local land use and control measures consistent" therewith. Any appellant aggrieved by the final determination may appeal to the United States District Court within 60 days of notice of that determination.

Plaintiff applied to participate in the National Flood Insurance Program in June, 1971. In July, 1971, it was authorized to participate in a program providing temporary emergency flood insurance pursuant to 42 U.S.C. § 4106, pending determination of risk premium rates. Later that year HUD contracted with the United States Army Corps of Engineers (hereinafter the Corps) to undertake flood insurance studies pursuant to the 1968 Act. Following the completion of those studies, the Flood Insurance Administration (FIA) issued a Flood Insurance Study for the Town of Falmouth in December, 1972. The town was eventually admitted to the program in May, 1973. On February 28, 1974, plaintiff appealed the December, 1972 Flood Insurance Study. It was plaintiff's contention that the established flood elevations were arbitrary and unsupported by sound data and sound scien-

tific principles. It was subsequently determined by FIA that some of the proposed flood elevations were incorrect and the decision was made that they would be modified.

On August 18, 1975, FIA notified plaintiff as to modifications of the flood elevations in the December, 1972 Study and informed it that members of the community had 90 days from the date of publication of the notice in the Federal Register to exercise an appeal as to the new flood elevations. That notice was published on August 28, 1975.

In September, 1975, a new Flood Insurance Study reflecting the revised flood elevations was issued. Plaintiff's second appeal was filed in November, 1975. FIA then referred this appeal to Dames & Moore, an independent scientific and technical consulting firm, for advice, pursuant to 42 U.S.C. § 4104(e).

In a letter dated April 28, 1976, FIA's Assistant Administrator for Flood Insurance notified plaintiff that the new flood elevations proposed on August 8, 1975 were in effect as of that date. He stated at that time that, despite a request made for technical information which would support those points in plaintiff's appeal which addressed the data and methodology used in the establishment of the elevations, plaintiff did not submit such information.

On May 12, 1976, FIA notified plaintiff by letter that it had 90 days to adopt flood plain management measures that would comply with program regulations. The letter went on to state that

in order for your community to maintain its eligibility in the Program, all the standards in [Section 1910.3(e) of the National Flood Insurance Program] must be enacted in a legally enforceable document and a certified copy must be submitted to this office for approval. . . .
Please consider this letter your formal notice. Failure to adopt the required flood plain management measures by the end of this 90-day period will result in suspension of Falmouth's eligibility in the National Flood Insurance Program. . .

The letter closed by urging plaintiff to contact FIA's Flood Insurance Specialists for any assistance needed in adopting the necessary measures.

A meeting eventually took place in Falmouth on June 25, 1976, comprised of representatives from FIA and Dames & Moore, and representatives and citizens of Falmouth, for the purpose of reviewing the Flood Insurance Study and answering questions. It was at this meeting that FIA was first informed that a law suit had been filed on June 23, 1976, in which plaintiff was appealing the final determination.

On July 2, 1976, plaintiff by letter proposed to FIA an alternate method for determining flood elevations set forth in a paper prepared by a hydrologist named Dr. Arthur Miller of the Woods Hole Oceanographic Institute. Stating that it planned to gather the data and carry out the studies required by the Miller paper, plaintiff felt it would need six months to do so. It then proposed an interim agreement for such a period of time under which FIA would not suspend plaintiff from the National Flood Insurance Program and the Selectmen of Falmouth would recommend adoption of a flood plain ordinance based on flood elevations two feet less than those determined by FIA. This proposal was rejected by FIA in its letter of July 20, 1976. FIA stated that the alternate method was being evaluated by the Corps but that the established flood elevations would remain in effect pending the decision as to the new method's validity. In addition, plaintiff was notified that unless it enacted the ordinances required under 24 C.F.R. § 1910.3(e), it would be suspended from the National Flood Insurance Program on September 8, 1976. On August 16, 1976, plaintiff filed a motion for a preliminary injunction. The parties thereafter agreed to stay plaintiff's suspension until September 20, 1976, since the motion was to be heard on September 16, 1976.

While there are several reasons for which I feel an injunction should not be issued in this case, I will state initially that plaintiff has not shown to my satisfaction that sus-

pension from the National Flood Insurance Program will cause irreparable harm. While admittedly suspension precludes the Town of Falmouth from purchasing federally subsidized flood insurance, there is no indication that plaintiff or property owners within Falmouth will be unable to purchase flood insurance from private insurance companies. Although the cost of such insurance might well be more than that offered by the federal government, that does not constitute the irreparable harm necessary for the granting of a preliminary injunction. Dealing with this prerequisite to such an injunction, one court has stated:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Virginia Petroleum Jobbers Association* v. *Federal Power Commission,* 104 U.S.App. D.C. 106, 259 F.2d 921, 925 (emphasis in original).

Plaintiff has, in addition, argued that suspension from the program will leave owners or prospective owners of property within flood prone areas "unable to secure mortgage and other financing from any National Bank or other bank covered by the Federal Deposit Insurance program and possibly from state banks as well." This is not completely accurate. Although Section 4106(b) of Title 42 does provide for such a general prohibition, it does set forth various exceptions. By virtue of its most recent amendment, that section now provides:

> Each Federal instrumentality responsible for the supervision, approval, regulation, or insuring of banks, savings and loan associations, or similar institutions shall by regulation prohibit such institutions on and after July 1, 1975, from making, increasing, extending, or renewing any loan secured by improved real estate or a mobile home located or to be located in an area that has been identified by the Secretary as an area having special flood hazards, unless the community in which such area is situated is then participating in the national flood insurance program except that the prohibition contained in this sentence [shall not apply to] (1) any loan made to finance the acquisition of a residential dwelling occupied as a residence prior to March 1, 1976, or one year following identification of the area within which such dwelling is located as an area containing special flood hazards, whichever is later, or made to extend, renew, or increase the financing or re-financing in connection with such a dwelling, (2) any loan, which does not exceed an amount prescribed by the Secretary, to finance the acquisition of a building or structure completed and occupied by a small business concern, as defined by the Secretary, prior to January 1, 1976, (3) any loan or loans, which in the aggregate do not exceed $5,000, to finance improvements to or rehabilitation of a building or structure occupied as residence prior to January 1, 1976, or (4) any loan or loans, which in the aggregate do not exceed an amount prescribed by the ·Secretary, to finance nonresidential additions or improvements to be used solely for agricultural purposes on a farm.

While the above section certainly precludes property owners in towns not participating in the flood insurance program from obtaining financing in certain situations, it has provided for exceptions. There is also no indication they are precluded from obtaining financing from *all* banks, as suggested by plaintiff.

Defendant has made the well taken point that by suspending Falmouth, defendant is merely returning the town to the position it occupied prior to its participation in the National Flood Insurance Program. While arguably plaintiff can never be in the same position it occupied before its participation since, prior to its application in 1971, obtaining of financing was not specifically restricted by 42 U.S.C. § 4106(b) (which became effective in 1975), I do not feel that

the effect of that section upon plaintiff and owners of property within Falmouth can be considered harm irreparable in nature.

Plaintiff has also argued that its suspension from the program will preclude it from receiving disaster assistance from the federal government following a hurricane or storm. A reading of the pertinent sections of the 1973 Act seems to indicate that this is the case, at least with regard to assistance for permanent repair or reconstruction after such a disaster. It apparently is not so when assistance is needed for temporary or emergency repair concerned with safeguarding lives and property. *See* Senate Rep. No. 93–583, at 11; U.S.Code Cong. & Admin.News, 1973, p. 3217.

Although the arguments plaintiff has raised as to the irreparable harm that will be caused by its suspension have pointed out difficulties that property owners within Falmouth will experience concerning the obtaining of insurance and financing, they have not persuaded this Court that any harm that might result is of the nature that requires an injunction. I understand the ramifications that arise from flood elevations being set at levels higher than plaintiff believes are appropriate. In addition, I am sure that plaintiff honestly feels its proposed alternative means of determining those elevations are valid. Nevertheless, I cannot ignore the fact that while plaintiff attempts to resolve its disagreements with FIA in court, it can remain in the National Flood Insurance Program by passing the measures required under that program. Granted, such a course of action may in the long run cause inconvenience to plaintiff and property owners. Nevertheless, it enables the concerned property owners in Falmouth to remain insured and obtain the financing that may be needed. In the future, should the Court decide that the existent flood elevations were not properly determined, those determinations may be set aside and, after new determinations are made, the town ordinances may be modified or new ones promulgated that would then be appropriate.

Plaintiff has failed to show that there is a likelihood of it prevailing on the merits of its case. The Court is not persuaded by its assertion that defendant's conduct concerning the determination of flood elevations and treatment of plaintiff's subsequent appeals violated plaintiff's right to due process as provided by 42 U.S.C. § 4101. There is nothing to indicate that the normal manner for making the determinations in question was irregular or that the notice or appeals procedures required by Section 4104 were not adhered to. Section 4104(b) states in part:

> The sole basis for such appeal shall be the possession of knowledge or information indicating that the elevations being proposed by the Secretary with respect to an identified area having special flood hazards are scientifically or technically incorrect, and the sole relief which shall be granted under the authority of this section in the event that such appeal is sustained in accordance with subsection (e) or (f) of this section is a modification of the Secretary's proposed determination accordingly.

The manner in which an appeal such as plaintiff's is resolved is set forth in Section 4104(e), which states in part:

> Upon appeal by any community, as provided by this section, the Secretary shall review and take fully into account any technical or scientific data submitted by the community that tend to negate or contradict the information upon which his proposed determination is based. The Secretary shall resolve such appeal by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to an independent scientific body or appropriate Federal Agency for advice.

From what has been presented to the Court, it appears as if defendant, in its consideration of plaintiff's appeals, met the minimal due process requirements under the statute. There has been communication between plaintiff and defendant that may satisfy what Section 4104(e) calls "consultation". In addition, it appears as if defend-

ant did seek the advice of an independent scientific body.

Should plaintiff decide to pursue its appeal before this Court, presumably the evidence that will be presented will be of the nature discussed in 42 U.S.C. § 4104(b). At that time, the Court will have the opportunity to consider fully all of plaintiff's allegations. Until then, however, based on the reasoning set forth herein, I feel that a preliminary injunction or stay order in this case may not properly be issued.

Accordingly, plaintiff's motions for preliminary injunction and stay order are denied.